IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANTHONY MADISON, et al.           *

        Plaintiffs           *

       vs.                  *   CIVIL ACTION NO. MJG-12-1120

HARFORD COUNTY, et al.            *

        Defendants           *

\*      \*      \*      \*      \*      \*      \*      \*      \*

MEMORANDUM AND ORDER RE: SUMMARY JUDGMENT/DISMISSAL

The Court has before it Defendants', Jason Flemmens, Todd Johnson, Jennifer Huey, Emma Virginia Courtney, Christopher Jones, Sherman Kirk, Theresa Pounds, and Rickey Harper, Second Motion to Dismiss, or in the Alternative Motion for Summary Judgment [Document 35] and the materials submitted relating thereto. The Court has held a hearing and had the benefit of the arguments of counsel.


I.   SUMMARY BACKGROUND

On the evening of June 11, 2009, Dwight Jerome Madison ("Madison"), a navy veteran suffering from mental illnesses, was arrested for trespassing by Harford County Sheriff Office Deputies Todd Johnson ("Officer Johnson") and Jason Flemmens ("Officer Flemmens"). Madison was transported and delivered to the Harford County Detention Center Processing Center (the

"Detention Center") where he was held for processing.  After

arriving at the Detention Center, Madison interacted with

several Detention Center personnel - Jennifer Huey ("Huey"),

Emma Virginia Courtney ("Courtney"), Christopher Jones

("Jones"), Sherman Kirk ("Kirk"), Theresa Pounds ("Pounds"), and

Rickey Harper ("Harper") (collectively referred to as the "DC

Defendants").  There was an incident, during which Huey fired a

taser, striking Madison who then fell to the floor and was

severely injured.  Madison was taken to the University of

Maryland Shock Trauma Center and died as a result of his

injuries the next day.[1]

In the Amended Complaint[2] [Document 14], Plaintiffs

presented claims against the Harford County Council, the Harford

County Executive, Sheriff Jesse L. Bane, Officer Johnson,

Officer Flemmens, and the DC Defendants in seven Counts:

|  |  |
|---|---|
| Count I | Survival Act |
| Count II | Wrongful Death |
| Count III | Excessive Force/Police Brutality |
| Count IV | Assault & Battery |

---

[1]    The taser incident occurred after midnight on June 11, thus
on June 12 and Madison died the next day, June 13.

[2]    The procedural history of this case is regrettable.
Plaintiffs' original counsel filed an initial case, MJG-10-197,
but due to his health concerns dismissed that case voluntarily
without prejudice.  The instant case, MJG-12-1120, is proceeding
as if there had been no voluntary dismissal of MJG-10-197
mutatis mutandis [Document 16].

|            |                                                    |
|------------|----------------------------------------------------|
| Count V    | Deprivation of Civil Rights, 42 U.S.C. § 1983      |
| Count VI   | Negligent Training and Supervision                 |
| Count VII  | Intentional/Negligent Infliction of Emotional Distress |

Consistent with the Court's rulings in MJG-10-197, all claims against Sheriff Bane, the Harford County Council Members, and the Harford County Executive have been dismissed [Documents 53, 63].[3] With respect to the remaining defendants, fact discovery has been completed.[4]

By the instant motion, Defendants move for dismissal of all claims in the Amended Complaint pursuant to Federal Rule of Civil Procedure[5] 12(b)(6) or alternatively for summary judgment under Rule 56.

II.  <u>APPLICABLE STANDARDS</u>

The Defendants have captioned their motion as a motion to dismiss pursuant to Rule 12(b)(6) or, alternatively, for summary judgment.  The parties have, however, submitted extrinsic evidence in support of their respective positions.  If, on a

---

[3]   The Court shall, therefore, dismiss Count VI.
[4]   Including a deposition of Gregory Wright taken after argument on the instant motion.
[5]   All "Rule" references herein are to the Federal Rules of Civil Procedure.

12(b)(6) motion, "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."[6]  Fed. R. Civ. P. 12(d). Therefore, the Court shall utilize the summary judgment standard in regard to the instant motion except, as indicated herein, the Rule 12(b)(6) standard[7] shall be applied to certain of the state law claims that were not adequately pleaded.

A motion for summary judgment shall be granted if the pleadings and supporting documents show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. 56(a).

The well-established principles pertinent to such motions can be distilled to a simple statement. The court may look at the evidence presented in regard to the motion for summary judgment through the non-movant's rose colored glasses, but must view it realistically.  After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be

---

[6]    Where the parties both rely on materials outside the pleadings, it is not necessary to provide them with any further opportunity to present any additional materials as to the claims considered for summary judgment.

[7]    To avoid dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts to "cross 'the line between possibility and plausibility of entitlement to relief.'"  Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)).

entitled to judgment as a matter of law. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).


III. THE FEDERAL CLAIMS

In the Amended Complaint, Plaintiffs assert federal claims against:

> 1. The "Arresting Officers" - Defendants Johnson and Flemmens, who allegedly unlawfully arrested Madison and transported him to the Detention Center;
>
> 2. The "DC Defendants" - Defendants Jennifer Huey, Emma Virginia Courtney, Christopher Jones, Sherman Kirk, Theresa Pounds, and Rickey Harper who were present at the time Madison suffered his fatal injury; and
>
> 3. The "Inactive Defendants" – the Harford County Council, the Harford County Executive, and Sheriff Jesse L. Bane.

All claims have been dismissed against the Inactive Defendants. See [Document 21]. The claims against the Arresting Officers and the DC Defendants shall be addressed in turn.


A.    The Arresting Officers

At the hearing, Plaintiffs clarified their federal claim against Officers Johnson and Flemmens as based upon the arrest of Madison without probable cause and not upon any theory that unlawful force was used.

Title 42 U.S.C. § 1983 prohibits a person acting under the color of law from depriving another of "any rights, privileges, or immunities secured by the Constitution and laws."

The Fourth Amendment, applicable to the States through the Fourteenth Amendment, guarantees against unreasonable seizures of persons and an arrest without probable cause is unreasonable. See, e.g., Dunaway v. New York, 442 U.S. 200, 208 (1979). The Fourth Amendment permits an arrest without a warrant if the arresting officer has probable cause to believe the suspect has committed a crime. United States v. Williams, 10 F.3d 1070, 1073 (4th Cir. 1993). "An officer has probable cause to believe a suspect has committed a crime if the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, in the circumstances shown, to conclude that the suspect has committed an offense." See, e.g., United States v. Ashley, 490 F. App'x 512, 513 (4th Cir. 2012) cert. denied, 133 S. Ct. 391 (U.S. 2012). In determining whether probable cause existed for an arrest, a court must look at the "totality of the circumstances" surrounding the arrest. Illinois v. Gates, 462 U.S. 213, 230-32 (1983).

The evidence of record establishes that Officer Johnson, alone, responded to complaints of a person banging on apartment doors and, upon his arrival at the scene, encountered Madison. Johnson Aff. [Document 22-4] ¶ 4-7. Because Madison was not a

6

resident of the apartment complex, Johnson informed Madison he was trespassing and told him to leave.  According to Johnson's Affidavit, Madison then left and Johnson did not arrest or place Madison in custody.  Id. ¶ 9-17.  Later that evening, Officer Flemmens responded, alone, to another complaint of a person banging on doors at the same apartment building.  Flemmens Aff. [Document 22-5] ¶ 3-4.  Officer Flemmens stated in his affidavit that Officer Johnson had informed him of his prior interaction with Madison at that apartment building and Johnson's request to Madison that he leave the premises.  Id. ¶ 5.  Upon arrival at the apartment building, Officer Flemmens encountered Madison who informed Officer Flemmens that he was homeless, was looking for a friend, had nowhere to go, and that Flemmens should just arrest him for trespassing because he would at least "have three squares and a cot."  Id. ¶ 6-9; Flemmens Dep. [Document 37-1], Ex. 2 at 50.  Flemmens then arrested Madison for trespassing and transported him to the Detention Center.

### 1.  Officer Johnson

Plaintiffs present no evidence indicating, much less adequate to prove, that Officer Johnson arrested or seized Madison, participated in Madison's arrest, or was even present during Madison's arrest.  Moreover, there is no evidence that could establish that Officer Johnson's communication to Officer

Flemmens about Madison was false or in any way improper.  Hence,
there is no evidence adequate to establish that Officer Johnson
could be held liable even if Flemmens had wrongfully arrested
Madison.


     2.  <u>Officer Flemmens</u>

    Plaintiffs contend that Officer Flemmens lacked probable
cause to arrest Madison because trespassing is a misdemeanor
offense and Officer Flemmens did not witness Madison commit the
offense prior to making a warrantless arrest.

    "It is well established that the warrantless arrest of an
individual who has committed a misdemeanor in the arresting
officer's presence is consistent with the Fourth Amendment if
supported by probable cause."  <u>Lee v. O'Malley</u>, 533 F. Supp. 2d
548, 551 (D. Md. 2007).  As explained by the Supreme Court,
"when an officer has probable cause to believe a person
committed even a minor crime in his presence, the balancing of
private and public interests is not in doubt. The arrest is
constitutionally reasonable."  <u>Virginia v. Moore</u>, 553 U.S. 164,
171 (2008) (explaining violation of state arrest law is not
necessarily a Fourth Amendment violation).  The question of
whether probable cause existed, justifying a suspect's arrest,
is ultimately a question of law.  <u>See</u> <u>Brown v. Gilmore</u>, 278 F.3d
362, 367-68 (4th Cir. 2002); <u>Smith v. Reddy</u>, 882 F. Supp. 497,

500 (D. Md. 1995) aff'd, 101 F.3d 351 (4th Cir. 1996).

Plaintiffs have produced no evidence contradicting Officer Flemmens' affidavit that, prior to encountering Madison, Officer Johnson had informed him that Johnson had previously asked Madison to leave the apartment building after resident complaints of someone banging on doors. Nor have Plaintiffs provided evidence calling into question that upon arrival at the apartment building in response to a second complaint, Flemmens observed Madison there and was informed by Madison that he was not a resident of the building and was homeless. Based upon this undisputed evidence, the Court concludes that a reasonable officer in Officer Flemmens' position would have been warranted in believing that Madison was trespassing at the apartment building in the officer's presence. Thus, Plaintiffs have failed to produce evidence adequate to prove that Officer Flemmens' warrantless arrest of Madison for trespassing violated the Fourth Amendment.

### 3.  Resolution

The Court finds that Officer Johnson did not participate in the arrest of Madison and Officer Flemmens did not unlawfully arrest Madison. Inasmuch as all claims against these Defendants are based upon their participation in an unlawful arrest, Officers Johnson and Flemmens are entitled to summary judgment

with regard to all federal claims asserted against them.

## B.  The Detention Center Defendants

Plaintiffs claim that the DC Defendants violated Madison's
federal Constitutional right to be free from excessive force by:
1) tasing him "without cause or need" and (2) "dropping him on
the concrete floor after he was immobilized."  Pls.' Opp'n
[Document 37] at 21.  The DC Defendants seek summary judgment on
qualified immunity grounds. Plaintiffs assert material disputes
of fact exist surrounding the interactions between Madison and
the DC Defendants.

### 1. Applicable Constitutional Standard

Initially, the Court must determine which Constitutional
guarantee the DC Defendants' actions allegedly infringed.  See
Graham v. Connor, 490 U.S. 386, 394 (1989) ("In addressing an
excessive force claim brought under § 1983, analysis begins by
identifying the specific constitutional right allegedly
infringed by the challenged application of force.").  The
parties dispute whether Madison's unlawful force claim – arising
after his arrest but before formal charging – must be considered
under the Fourth Amendment's unlawful seizure provision or the
Fourteenth Amendment's substantive Due Process Clause.

The Fourth Circuit has stated that during the course of

"'an arrest, investigatory stop, or other 'seizure' of a
person'", the protections of the Fourth Amendment that require
the use of objectively reasonable force are applicable.  <u>Robles
v. Prince George's Cnty.</u>, 302 F.3d 262, 268 (4th Cir. 2002)
(quoting <u>Riley v. Dorton</u>, 115 F.3d 1159 (4th Cir. 1997),
<u>abrogated on other grounds by</u> <u>Wilkins v. Gaddy</u>, 559 U.S. 34
(2010)).  But, "[o]nce the single act of detaining an individual
has been accomplished, the [Fourth] Amendment ceases to apply."
<u>Id.</u>  After the incidents of a suspect's arrest are complete, the
Fourth Circuit considers the suspect or "arrestee" protected
only from "unnecessary and wanton pain and suffering" prohibited
by the substantive Due Process Clause of the Fourteenth
Amendment.  <u>Id.</u> at 269; <u>Young v. Prince George's Cnty., Md.</u>, 355
F.3d 751, 758 (4th Cir. 2004).[8]

Under Fourth Circuit precedent, the "point at which Fourth
Amendment protections end and Fourteenth Amendment protections
begin is often murky."  <u>Orem v. Rephann</u>, 523 F.3d 442, 446 (4th
Cir. 2008).  However, in the instant case, the answer is clear.

---

[8]    The Fourth Circuit has rejected the notion of a "continuing
seizure" adopted by other Circuits that have held that the
Fourth Amendment governs excessive force claims arising after
the completion of arrest but before formal charging, booking,
and/or the suspect leaving custody of the arresting officers.
<u>See</u> <u>Austin v. Hamilton</u>, 945 F.2d 1155, 1160-62 (10th Cir. 1991),
<u>abrogated on other grounds by Johnson v. Jones</u>, 515 U.S. 304
(1995); <u>Powell v. Gardner</u>, 891 F.2d 1039, 1043 (2d Cir. 1989);
<u>McDowell v. Rogers</u>, 863 F.2d 1302, 1306 (6th Cir. 1988).

In Orem, the defendant police officer arrested Orem without a warrant, placed her in the back of a police car in restraints, and then began driving her to jail. Id. at 444. While en route, Orem became "unruly", which led to the officer pulling over the car and tasing her twice while she was restrained in the back seat. Id. at 444-45. In assessing the applicable standard for Orem's excessive force claim based on the tasing, the Fourth Circuit stated:

> . . . Orem's excessive force claim arises during her transport to [the jail], after she was arrested. While she had not been formally charged, her status as an arrestee requires application of the Fourteenth Amendment to her claim.

Id. at 446; see also Robles, 302 F.3d at 267-70 (concluding unlawful force claim that officers, after arrest, drove plaintiff to a parking lot and tied him to metal pole governed by the Fourteenth Amendment's Due Process Clause because the plaintiff's "arrest had been completed" at the time he was tied to the pole).

At the time of the events at issue, Madison had been arrested, transported to the Detention Center, and was in the booking process. Under Fourth Circuit precedent, the incidents of arrest had been completed.

Plaintiffs present reasonable arguments supporting their view that Madison was entitled to Fourth Amendment protection at

the time at issue.  This position has been accepted by other Circuits.[9]  Moreover, the Supreme Court has yet to address the conflicting lower court decisions.  See <u>Graham v. Connor</u>, 490 U.S. 386, 395 n.10 (1989) (declining to address the issue). Nevertheless, the Court must follow the existing binding precedent of the United States Court of Appeals for the Fourth Circuit.  Therefore, the substantive Due Process Clause of the Fourteenth Amendment governs Plaintiffs' excessive force claims surrounding the tasing of Madison at the Detention Center after Madison's arrest but before completion of his processing or formal charging.

Hence, Plaintiffs must prove that one or more of the DC Defendants inflicted unnecessary and wanton pain and suffering upon Madison as prohibited by the substantive Due Process Clause of the Fourteenth Amendment.

## 2.   <u>The Use of the Taser</u>

The essential events at issue occurred within a brief period in the Detention Center processing room.  Although not precisely to scale, the following sketch provides a reasonable rendition of the layout of the processing room:

_____

[9]      <u>See</u> cases cited in <u>supra</u> note 8.



The evidence presented consists of statements by the DC Defendants and Gregory Princeton Wright II ("Wright"), a prisoner then in the second holding cell. In addition, the evidence includes a video , without sound, produced by the camera, shown near the lower right hand corner of the room.

    a.   <u>The Video</u>

While the parties seek to place different "spins" on what is shown by the video, it cannot reasonably be disputed that the following can be seen:

<u>Time</u>

0:00-3:45[10]          Madison, a six foot, 235 lb. male[11], wearing ankle shackles, sits in a chair

---

[10]    Time is shown in "minutes:seconds" from the start of the video segment in evidence.
[11]    <u>See</u> Investigative Report [Document 37-1], Ex. 5.

next to the holding cell, walks around, and one DC Defendant appears to speak to Madison while the others are standing close by in the general vicinity of the holding cells.

3:46-58        Madison sits back down in the chair, starts moving the chair while seated in it by sliding it on the floor and lifting it slightly off the floor; DC Defendants start to circle closely around Madison.

3:59-4:20        Physical interaction between Madison and certain DC Defendants as a few of them attempt to keep Madison seated in the chair after he tries to stand up, while two others remove Madison's ankle shackles.

4:21-38        Madison, with two DC Defendants physically guiding him, gets up from the chair and walks towards the holding cell. A struggle ensues in the doorway of the holding cell between Madison and three of the DC Defendants (identified through other evidence as Jones, Harper, and Kirk) as Madison resists their efforts to get Madison into the cell.

4:39        Huey deploys the taser dart.[12]

4:40-44        The DC Defendants are crowded around the cell door and Madison appears to lunge partially out of the doorway toward the DC Defendants, who then press him back into the cell.

4:45-54        Something is occurring inside or in the

---

[12]    Undisputed record evidence establishes that Huey deployed the taser after Courtney, the shift supervisor, ordered her to do so.

|        |                                                  |
|--------|--------------------------------------------------|
|        | doorway of the cell involving at least one of the DC Defendants and Madison, but due to the camera angle only the backs of several of the DC Defendants crowding the cell door are visible. |
| 4:55   | With all of the DC Defendants outside Madison's cell, one of them closes the cell door. |
| 4:56-5:37 | The DC Defendants begin to disperse, but some are looking into Madison's cell. |
| 5:38-11:03 | A medical person arrives, Madison's cell is open, the medical person enters the cell and presumably provides medical services to Madison. |

b. <u>Other Evidence</u>

In addition to the video, the evidence consists of sworn statements of witnesses and deposition testimony.  As discussed herein, there is no genuine issue of <u>material</u>[13] fact regarding the events culminating in Huey's use of the taser on Madison.

After fingerprinting, Madison declined to be photographed. Courtney Aff. [Document 22-6] ¶¶ 9, 10.  Courtney ordered Madison to return to his holding cell on "several occasions" but he refused.  <u>Id.</u>; Harper Aff. [Document 22-7] ¶ 8.  After Madison sat down in the chair, Pounds removed Madison's ankle shackles and then Harper, Jones, and Kirk attempted to get

---

[13]    As noted, there are factual issues.  However, the issues are not material to the resolution of Plaintiffs' claims.

Madison back in the holding cell, but he refused.  Harper Aff.

[Document 22-8] ¶ 9; Courtney Aff. ¶ 10; Huey Aff. ¶ 10.  Once

the officers got Madison in the holding cell, Madison started to

struggle, trying to come out of the cell before the door had

closed, and then, Madison grabbed Harper by the shirt collar

with one hand.[14]    Courtney Aff. ¶ 11; Harper Aff. ¶ 10; Huey

Aff. ¶ 11.  A struggle ensued where Jones and Kirk tried to pull

---

[14]    Plaintiffs maintain that the DC Defendants' deposition
testimony is inconsistent as to the "choke" of Harper by Madison
prior to discharge of the taser.  Specifically, Courtney,
Harper, and Kirk testified that Madison put both his hands
around Harper's neck. Courtney Dep. [Document 37-1] at 50-52;
Harper Dep. [Document 37-1] at 50; Kirk Dep. [Document 37-1] at
35-36.  Jones testified that Madison put only his left hand
around Harper's neck and Pounds testified that Madison grabbed
Harper's shirt collar with his left hand.  Jones Dep. [Document
37-1] at 35-36; Pounds Dep. [Document 37-1] at 82-83.
Plaintiffs also submitted a photograph of Madison lying on the
ground on his back after the tasing, which depicts something
clutched in his one hand.  A second close-up photograph reveals
the "something" is a glasses case containing a pair of undamaged
glasses. See [Document 37-1] Ex. 6.  This evidence corroborates
the version of events in which Madison choked or grabbed Harper
with only one hand.
    The record evidence related to the DC Defendants'
interactions with Madison in the 18-20 seconds leading up to the
taser discharge reveals factual disputes as to whether Madison
grabbed Harper with one or two hands, whether Madison grabbed
Harper's neck or shirt collar, and whether Madison just put his
hands around Harper's neck or actually tried to choke him.  In
the summary judgment context, Plaintiffs, as the non-moving
parties, are entitled to have their "version of all that is in
dispute accepted, [and] all internal conflicts in it resolved
favorably" to them.  Charbonnages de France v. Smith, 597 F.2d
406, 414 (4th Cir. 1979); Meyers v. Baltimore Cnty., Md., 713
F.3d 723, 730 (4th Cir. 2013).  Hence, for present purposes the
Court will accept the version of events most favorable to
Plaintiffs: Madison grabbed Harper's shirt collar with one hand
prior to Huey's deployment of the taser.

Madison from Harper; Courtney then ordered Huey to tase Madison. Huey told Madison "two or three times to 'Let go, or you will be tased' while displaying a departmentally issued taser."[15]  Huey Aff. ¶ 11.  Madison did not let go.  Huey fired the taser once, and hit Madison in the upper leg.  Courtney Aff. ¶ 12; Harper Aff. ¶ 11; Huey Aff. ¶ 12; Courtney Dep. [Document 37-1] at 50-51.

Plaintiffs seek to find evidentiary support in statements from Wright, who was in the second holding cell at the time of the events at issue.  Wright's evidence includes three – not precisely consistent – versions of the events at issue.

The first version is in a recorded statement[16] made a few hours after the incident in an interview conducted by members of the Harford County Sheriff's Office.  In this statement Wright said that during the struggle in the doorway of the holding cell, Madison "wouldn't go in" and was "fighting" the officers and "throwing punches."  [Document 26-2] at 2-3.

The second version was included in an affidavit drafted by an attorney for Plaintiffs and signed by Wright.  Wright testified at his deposition that the statements in his affidavit

---

[15]  Plaintiffs dispute whether sufficient time existed for Huey to provide two or three verbal warnings.  The Court does not find a factual dispute as to the number of warnings material.
[16]  The statement was not given under oath but, in his deposition testimony, Wright confirmed that the transcript of the oral statement "accurately reflect[ed] what [he was] feeling and observed." Wright Dep. [Document 42-1] at 18:16-19.

were not his "exact words" but he read it and "kind of like agreed, and signed it." Wright Dep. [Document 42-1] at 42. The affidavit states that Madison did not "choke", make a "choking gesture", or "have his hands on or around the neck of any officer or civilian employee"; did not "punch, kick, or push any of the law enforcement officers or civilian employee(s)"; and/or did not "threaten any of the law enforcement officers or civilian employee(s)." Wright Aff. [Document 25-2] ¶ 6-10.

The third version is in Wright's deposition. Wright testified that when the official approached Madison in the chair "he was real belligerent, to them." Wright Dep. [Document 42-1] at 47:11-12. Wright was directed to review his affidavit statement that "Madison was not resisting when law enforcement officers and civilian employee(s) approached him and violently and forcibly removed him from his chair."[17] In response he stated that Madison "was resisting because they was trying to put the leg cuffs on him. [] He just wouldn't let them." Id. at 47:16-21.

"[I]t is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct." In re Family Dollar FLSA Litigation, 637 F.3d 508, 512-13 (4th Cir. 2011) (quoting Erwin v. United States, 591 F.3d

---

[17]    Wright Aff. [Document 25-2] ¶ 4

313, 325 n.7 (4th Cir. 2010)).  Thus, Defendants ask the Court

to disregard Wright's testimony altogether.  Because Wright is

not a party, the general rule about inconsistent testimony may

not apply to him.  In any event, while there are differences

between Wright's statements, in the context of the instant case,

the differences are not <u>material</u>.  Wright's affidavit does not

directly contradict his statement that Madison "wouldn't go in"

and was "fighting" the officers and "throwing punches."[18]  Nor

does it directly contradict the testimony, noted above, that

Madison grabbed Harper by the shirt collar with one hand.

     In sum, at the very least, the evidence establishes that

Madison was noncompliant, struggling, resisting the officers,

and refusing to enter and stay in his cell.  It is in this

context that the decision was made to use a taser on Madison.


                    c. <u>Liability</u>

     To succeed on an excessive force claim under the Fourteenth

Amendment's Due Process Clause, Plaintiffs must show that the DC

Defendants "inflicted unnecessary and wanton pain and suffering"

upon Madison.  <u>Carr v. Deeds</u>, 453 F.3d 593, 605 (4th Cir. 2006).

This requires a finding that the "officers' actions amounted to

---

[18]    It is not material whether, in addition to fighting and
throwing punches, Wright actually hit any of the officers,
choked, made a choking gesture, had his hands on or around the
neck of, kicked, pushed or threatened any of the DC Defendants.

punishment and were not merely an incident of some other legitimate governmental purpose." Robles v. Prince George's Cnty., Md., 302 F.3d 262, 269 (4th Cir. 2002)(internal citations and quotations omitted). As explained by the Fourth Circuit:

> In determining whether [this] constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm.

Orem v. Rephann, 523 F.3d 442, 446 (4th Cir. 2008)(quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). Contrary to a Fourth Amendment excessive force claim that employs an objective reasonableness standard, the subjective motivations of the individual officers allegedly exerting unlawful force is pertinent in a substantive Due Process claim. See Young v. Prince George's Cnty., 355 F.3d 751, 758 (4th Cir. 2004).

In Orem, the Fourth Circuit confronted the issue of whether the use of a taser on an arrestee constituted excessive force under the Due Process Clause. In that case, Orem, a 100 pound 27-year-old woman who was handcuffed and locked in the back seat of a police car post-arrest, began "jumping around" and banging her head against the seat and window during her transportation to jail. 523 F.3d at 444-45. The transporting officer pulled

the police car over and was then joined by two other officers. While one officer started to re-secure Orem's ankle shackles that had become loosened as a result of her flailing about, the defendant officer, Deputy Rephann[19] (weighing 280 lbs.), told Orem to calm down to which Orem responded with a forceful expletive. Id. at 447. Deputy Rephann told her to "stop it", tased her under her left breast and inner thigh, though his "reach was closer to her right side and other parts of her body", and then "commanded that she respect the officers." Id. In light of that set of facts, the Fourth Circuit found that a reasonable jury could infer that Deputy Rephann's use of the taser was "wanton, sadistic, and not a good faith effort to restore discipline." Id.

Here, the undisputed evidence shows that after being fingerprinted Madison refused to be photographed, refused to return to his holding cell after being instructed to do so, and then started moving around on a chair. In response, certain of the DC Defendants used force to ensure Madison remained seated in the chair as his ankle shackles were removed[20] and then

---

[19]   Of note, Deputy Rephann knew Orem because her husband was a former sheriff deputy.
[20]   Plaintiffs assert that the removal of Madison's ankle shackles is evidence that the DC Defendants did not perceive his resistance as a threat. However, the ankle shackles were removed in anticipation of moving Madison to a holding cell and the significant resistance at issue occurred after removal of the ankle shackles.

22

physically escorted him in the direction of the holding cell.[21]
In the next 18-20 seconds prior to discharge of the taser, video
evidence shows Madison struggled against certain of the DC
Defendants as they tried to get him into the holding cell.
During this struggle – on the facts most favorable to Plaintiffs
– Madison a least grabbed Harper by the shirt collar with one
hand.  After being ordered to do so by Courtney, Huey deployed
the taser, making contact with Madison's upper leg area.

### i.  Defendants Jones, Kirk, Pounds, and Harper

The evidence establishes that Courtney ordered Huey to fire
the taser and Huey carried out the order.  Thus, these two
defendants caused the tasing.  However, Plaintiffs have produced
no evidence indicating that any other defendant could be found
to have caused the tasing of Madison.

Plaintiffs have presented no cogent support for a theory of
"collective liability" that would validate claims against
defendants who, although present, did not cause the alleged
excessive force.[22]

---

[21]    By physically escort, the Court means that two or three of
the DC Defendants were holding Madison's arms as he walked.
[22]    Even if there were some viable "liability by presence"
theory, the matter is moot because, as discussed infra, the
Court holds that there is insufficient evidence to establish
that Courtney or Huey violated Madison's Fourteenth Amendment
rights by using the taser.  See Thomas v. Holly, 12-2076, 2013

23

Accordingly, in regard to the use of the taser[23], Defendants Jones, Kirk, Pounds, and Harper are entitled to summary judgment due to the absence of any proof of causation or actionable conduct.[24]

ii. Defendants Courtney and Huey

The evidence establishes that Defendant Courtney ordered the use of the taser and Huey used the device to tase Madison once. Thus, Courtney and Huey caused Madison to have been subjected to the tasing. Nevertheless, the evidence, when viewed as favorably for Plaintiffs as reasonably possible, would not support a verdict that Madison was subjected to excessive force under the circumstances.

Madison, standing six feet tall and weighing 235 lbs., was actively resisting being placed in the holding cell. On the most pro-Plaintiffs version of the evidence possible, at a minimum, Madison "wouldn't go in [to the holding cell]," was "fighting, throwing punches," and had a hand on a Detention Center officer's shirt collar. See supra § III.B.2.b. Unlike Orem, Madison was not restrained in the backseat of a patrol

---

WL 3722350, at *12 (4th Cir. July 17, 2013) (unpublished).
[23] As distinct from the fall that resulted from the use of the taser.
[24] As discussed herein, Defendants Kirk and Jones are alleged to have caused Madison injuries by failing to prevent his fall after the taser was used.

car.  The amount and type of force employed on Madison consisted

of a single tase, discharged by Huey at the direction of

Courtney in response to Madison's struggles and grabbing of

Harper's shirt collar.  See Simpson v. Kapeluck,

CIV.A.209CV00021, 2010 WL 1981099, at *8 (S.D.W. Va. May 14,

2010), aff'd, 402 F. App'x 803 (4th Cir. 2010) (finding

defendants entitled to summary judgment in Fourteenth Amendment

excessive force claim involving taser where officer tased

plaintiff as he was being escorted out of courtroom in shackles

and handcuffs after he struggled against the officers).

　　　Plaintiffs seek to rely on the affidavit of Dr. Ron

Martinelli, a proffered expert in "police practices", as

evidence that the use of the taser was an excessive response to

Madison's behavior.  In his affidavit, Dr. Martinelli states

that if "no choke took place than the Taser would not have been

an appropriate quantum of force.  The Defendants possessed a

number of less lethal options."[25]  Martinelli Aff. [Document 25-

1] ¶ 8.  Such options – according to Dr. Martinelli - included

using "tactical communication and other non-violent methods" to

Madison's reluctance to be photographed or summoning a

psychiatrist or psychologist.  Id. ¶ 12.  Dr. Martinelli does

---

[25]    The use of a taser is not realistically referred to as a
"lethal option."  Indeed, Plaintiffs do not claim Madison
suffered any injury from the tase itself, but suffered injury
due to alleged wrongful action or inaction after Madison had
been tased.

not opine that a single tase would be inappropriate if a detainee is fighting, punching, and has a hand on an officer's shirt collar. Further, Dr. Martinelli's "less lethal options" opinions relate to a response to Madison's refusal to be photographed, not to the struggle that ensued when the DC Defendants attempted to move Madison to the holding cell after such refusal.

Plaintiffs assert that use of the taser was unnecessary "given that Mr. Madison was already physically restrained by multiple officers." [Document 37] at 17. Yet, the evidence shows, at minimum, that Madison was grabbing Harper's shirt collar with one hand, Kirk and Jones were attempting to pull Madison from Harper, and Madison did not relent until after being tased.[26]

Plaintiffs have produced no evidence adequate to establish that the taser was used maliciously and sadistically for the very purpose of causing harm to Madison and not in a good faith effort to maintain and restore discipline. Orem, 523 F.3d at 446. The evidence shows that Huey deployed the taser only once, indicating the "officers' 'good faith effort to restore

---

[26]    At the hearing, Plaintiffs' counsel suggested that the DC Defendants' slightly inconsistent testimony relating to the choking allegation supports an inference that the choking itself was an after-the fact concoction to justify the tasing. The Court does not agree and, in any event, has assumed that there was no choking but only that Madison had a hand on Harper's shirt collar.

discipline,' and not an intent 'to punish or intimidate.'"
Simpson, 2010 WL 1981099, at *9 (quoting Orem, 523 F.3d at 447,
449).  While the taser came into contact with Madison's upper
leg, there is no evidence that this placement was deliberate or
designed to cause Madison embarrassment, such as in Orem.  Also
– unlike in Orem – there is no evidence that Madison verbally
provoked Huey or Courtney prior to discharge of the taser or
that Huey or Courtney said or did anything to indicate they were
acting to punish Madison.  As discussed herein, the single tase
came in response to Madison's struggles against the DC
Defendants as they tried to get him into the holding cell and
his grabbing of Harper's shirt collar.  The evidence shows that
at this time Madison was not restrained by any shackles or
handcuffs and the DC Defendants were not in control of Madison's
bodily movements.  Cf. Wernert v. Green, 419 F. App'x 337, 342–
43 (4th Cir. 2011) (unpublished) (finding evidence demonstrated
force employed was not a good faith effort to restore discipline
where defendant slammed an already restrained detainee face
first into concrete floor after detainee kicked his shoe off at
another officer).

    As to the "extent of the injury inflicted", there is no
evidence that the use of the taser itself – distinct from the
fall that followed – inflicted severe injury upon Madison.
Indeed, Plaintiffs appear to assert that there would have been

no injury had there not been what Plaintiffs contend amounts to the wanton infliction of pain due to the failure of certain of the DC Defendants to break Madison's fall.

The bottom line is that no reasonable jury could find that the use of the taser by Huey, directed by Courtney, constituted wanton and sadistic conduct that was not carried out in a good faith effort to restore discipline.  That is, the evidence is insufficient to show that Courtney ordered and/or Huey used the taser needlessly or without a legitimate purpose.


d.  Qualified Immunity

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  The doctrine shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person.  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Court's apply a two-step approach to qualified immunity: (1) whether the facts alleged or shown, taken in the light most favorable to the plaintiff, establish a constitutional violation

and (2) whether the constitutional right at issue was clearly established at the time of the officer's conduct. See Saucier v. Katz, 533 U.S. 194, 201 (2001); Pearson v. Callahan, 555 U.S. 223, 236 (2009) (acknowledging that while Saucier's two-step sequence for resolving qualified immunity claims is generally appropriate, courts may exercise discretion in determining which of the two prongs should be addressed first). "Thus, although a plaintiff may prove that an officer has violated certain constitutional rights, the officer nonetheless is entitled to qualified immunity if a reasonable person in the officer's position could have failed to appreciate that his conduct would violate those rights." Meyers v. Baltimore Cnty., 713 F.3d 723, 731 (4th Cir. 2013) (internal quotations omitted).

The Court holds, herein, that the DC Defendants are entitled to summary judgment establishing that they did not violate Madison's Constitutional rights. Thus their right to qualified immunity is moot. However, for the benefit of any reviewing court, the Court states that it would find them entitled to qualified immunity even if summary judgment had not been granted in their favor as to a Constitutional violation.

Generally speaking, at the time of the incident at issue it was "clearly established that an arrestee or pretrial detainee is protected from the use of excessive force" where such force

is used to punish or intimidate.  *Wernert*, 419 F. App'x at 342
(citing *Orem*, 523 F.3d at 448).  Yet "[t]he calculus of
reasonableness must embody allowances for the fact that police
officers are often forced to make split-second judgments—in
circumstances that are tense, uncertain and rapidly evolving—
about the amount of force that is necessary in a particular
situation."  *Park v. Shiflett*, 250 F.3d 843, 853 (4th Cir.
2001). Even if the use of the taser had established a
Constitutional violation, it would not have been manifest to a
reasonable officer in the DC Defendants' positions that the use
of the taser in response to Madison's behavior would be
unlawful.


### 3.   The Post-Tasing Fall

Plaintiffs claim that "dropping [Madison] on the concrete
floor after he was immobilized" from the tasing amounted to the
infliction of unnecessary and wanton pain and suffering in
violation of his Constitutional rights.  Pls.' Opp'n [Document
37] at 21.

a. <u>Evidence</u>

i. <u>Direct Evidence</u>

Due to the position of the camera, the video evidence has limited value in regard to the post-tasing fall.  As noted above, the following can be seen in the video:

| | |
|---|---|
| 4:39 | Huey deploys the taser dart. |
| 4:40–44 | The DC Defendants are crowded around the cell door and Madison appears to lunge partially out of the doorway toward the DC Defendants, who then press him back into the cell. |
| 4:45–54 | Something is occurring inside or in the doorway of the cell involving at least one of the DC Defendants and Madison, but due to the camera angle only the backs of several of the DC Defendants crowding the cell door are visible. |
| 4:55 | With all of the DC Defendants outside Madison's cell, one of them closes the cell door. |
| 4:56–5:37 | The DC Defendants begin to disperse, but some are looking into Madison's cell. |
| 5:38–11:03 | A medical person arrives, Madison's cell is open, the medical person enters the cell and presumably provides medical services to Madison. |

Courtney testified that after Huey deployed the taser, it did not appear to have an effect on Madison, but after some undefined amount of time, Madison let go of Harper's neck area.

Courtney Dep. at 52-53. At "some point, [Madison] was standing in the doorway of the cell and DFC Harper was going to close it when he fell." Id. As far as Courtney could remember, Kirk and Jones were not in physical contact with Madison at the moment he fell back. See id. at 53-54. Pounds testified that she saw the taser discharge, saw Kirk and Jones let go of Madison, and then saw Madison fall to the ground. Pounds Dep. at 81-82. Photographic evidence taken after the tasing shows that Madison fell backwards flat on his back onto a non-carpeted surface. [Document 37-1] Ex. 5.

Wright referred to the post-tasing events in each of his three statements. In his recorded statement given June 12, 2009, Wright stated:

> MR. WRIGHT: The officer with the Taser. She said "Stop, stop fighting," . . . you know, stop fighting or whatever while they was trying . . . it was about maybe two male officers . . . there was three male officers trying to restrain him and she told him to stop and he didn't stop, so she tazed [sic] him and he fell straight back on his head.
>
> * * *
>
> SGT. ROYSTER: He had no problems walking or fighting off the officers though while he was on his feet, correct?
>
> MR. WRIGHT: No, he didn't have no problem.
>
> SGT. ROYSTER: And you also mentioned that when he fell back, he fell on his head?

MR. WRIGHT:     Yeah, straight back.  First
she's tazing [sic] him and he still wouldn't
go down and then like, I guess, it kicked in
and then he just went boom, straight back.

[Document 26-2], at 2, 6-7.

In his affidavit[27], Wright stated:

11.  Mr. Madison was being restrained and
supported by law enforcement officers and/or
civilian employee(s) at the moment the Taser
prongs impacted his body.

12.  After Mr. Madison was tased and at a
time when he was visibly immobilized, the
law enforcement officers and/or civilian
employee(s) who were supporting him suddenly
let him go.

13.  As a result of being dropped, Mr.
Madison, incapacitated by the taser, fell to
[sic] ground without the ability to break
his fall.

14.  Mr. Madison's head violently impacted
the ground, at considerable speed, with
great force.

15.  The law enforcement officers and/or
civilian employee(s) who were supporting Mr.
Madison possessed the ability to peaceably
lay him down on the floor after he was
immobilized by the Taser.

16.  It was immediately apparent that Mr.
Madison sustained a traumatic injury.

---

[27]     Drafted by one of Plaintiff's counsel, a document that
Wright testified did not contain "his exact words", but signed
because he "kind of like agreed."  Wright's Dep. [Document 42-1]
at 42.

Wright Aff. [Document 25-2].

In his deposition, Wright testified as follows:

> Q    Okay. All right.   And did you see the
>      moment when he was tased?
>
> A    I -- no.  I saw when he fell back.
>
> Q    Okay.
>
> A    I didn't see when he actually got
>      tased.
>
> Q    All right.   And right before he fell
>      back, there were officers who were in
>      contact with him holding either side;
>      is that right?
>
> A    Yes.
>
> Q    Okay.  And then he was tased.   And did
>      you see his body stiffen up as he was
>      tased?
>
> A    Yes
>
> Q    Okay. All right.   And I understand the
>      prongs are very small.   So you may not
>      have seen the actual prongs go in, but
>      you saw his body stiffen up?
>
> A    Yeah.
>
> Q    Okay.  All right.   And after his body
>      stiffened up, the officers let go.   Is
>      that what you observed?
>
> A    Yes.
>
> Q    All right.   And that's what caused him
>      to fall to the ground between the TASER
>      and them letting go; is that right?
>
> A    Yes.

* * *

Q    All right.  And the -- and you already
     said that when he was tased -- and it
     was in your statement to police that
     they were holding him.  And I'm looking
     at the Affidavit.  It says, Paragraph
     12: After Mr. Madison was tased and a
     time when he was immobilized -- in
     other words, they were holding him --
     you said -- you told me he stiffened
     up.  The law enforcement officers or
     civilian employees who were supporting
     him suddenly let go.  Is that accurate?

A    Somewhat.

Q    Okay.  In other words that --

A    They didn't just drop him.

Q    Okay.

A    I mean, like they was trying to subdue
     him, and once they tased him, I guess
     they felt like he was subdued.  So they
     just let go.

Q    Okay.

A    I don't think they thought he was going
     to fall back on his head, though.

Q    All right.  And tell me what you
     observed when he hit the ground.  You
     said in the Affidavit it was pretty
     immediately apparent that he had been
     hurt.  Tell me what happened.  Tell me
     what you saw.

A    As far as when he hit the ground?

Q    Yes, sir.

A    He hit the ground, and they called for
     medical.

> Q  Okay.  And was there a sound when he hit?
>
> A  No.  He just like hit flat.  I mean, it was a -- bold because like steel floors. So it was like -- he hit hard.
>
> Q  And did he make any noises after that that you heard?  Moaning or screaming or anything like that?
>
> A  I can't remember.

Wright Dep. [Document 42-1] at 52-53, 57-58.


ii.  <u>Circumstantial Evidence</u>

Plaintiffs seek to rely upon evidence relating – generally – to taser use and the DC Defendants' training.

1.  Dr. Martinelli stated that "Courts assign Tasers [the] rating [of an intermediate force weapon] primarily due to the dangerous risk of secondary impact injuries" and in his opinion the DC Defendants "were under an affirmative duty to peaceably lay Mr. Madison onto the ground as opposed to suddenly dropping him while he was immobilized."  Martinelli Aff. ¶¶ 13, 14.

2.  According to the 2005 Police Executive Research Forum's ("PERF") Conducted Energy Device Policy and Training Guidelines for Consideration[28], a "conducted energy device" "should not generally be used when a subject is in a location where a

---

[28]  According to the face of this document, the suggested policies and training guidelines contained therein were the result of nationwide research and surveys.  There is no evidence as to whether anyone at the Detention Center has seen this document and/or adopted any portion of it as Detention Center policy.  Indeed, there is no record evidence of the Detention Center's policies on taser use and/or taser training.

fall may cause substantial injury or death."
[Document 37-1] Ex. 3, ¶ 9.

3.  According to the 2009 Report of the Maryland
    Attorney General's Task Force on Electronic
    Weapons, agencies "should adopt a use-of-force
    model that recognizes that in the following
    situations involving a heightened risk of serious
    injury or death, ECWs should only be used when
    deadly force is otherwise legally permitted:
    persons in elevated positions, who might be at
    risk of a dangerous fall."[29] [Document 37-1] Ex.
    4.

4.  As to the DC Defendants'[30] training for taser use,
    at the time of the incident:

    a.  Jones, outside of "in-service training and
        the academy" (which is not further defined
        in the deposition excerpt), had no taser
        training and was not certified to use
        tasers;

    b.  Kirk was not certified for taser use, but
        had been certified in the use of stun guns,
        but as of June 2009 such devices were no
        longer used at the Detention Center;

    c.  Pounds received taser training and was
        certified to use tasers. As part of her
        training, Pounds testified that she watched
        a video provided by the taser company, which
        depicted an officer actually being tased and
        two other officers holding him up and
        helping him to the ground thereafter.
        Pounds also testified that she was aware
        that touching a person after he or she was
        tased would not cause you to be "shocked";
        and

---

[29]    Again, there is no evidence that anyone at the Detention
Center has ever seen this document and/or adopted any portion of
it as Detention Center policy.
[30]    There was no evidence submitted relating to taser training
and/or certification of DC Defendants Courtney and Harper.

> d. Huey admitted she was "trained" that a
>    person can die as a result of being tased if
>    that person has certain medical conditions.

    b.  Adequacy

Plaintiffs' claim is based on the contention that one or more of the DC Defendants inflicted "unnecessary and wanton pain and suffering" on Madison by failing to support him, or break his fall after[31] the taser was used.

The evidence presented is sufficient to support a finding that Kirk, Jones and, the Court will assume without finding, Harper were in a position to have supported or broke the fall of Madison and did not take such action.[32] However, the critical question is whether Plaintiffs have presented evidence adequate to permit a reasonable jury to find that any failure to take such action was wanton and sadistic in the sense of intentional action or inaction with the purpose of inflicting pain. See Orem v. Rephann, 523 F.3d 442, 448 (4th Cir. 2008).

To avoid summary judgment, Plaintiffs carry the burden to come forward with particular evidence to substantiate their

---

[31] As discussed above, the Court is granting the DC Defendants summary judgment on the use of the taser claim.

[32] At the time of the tase, Kirk and Jones were in physical contact with Madison and Madison was holding Harper's shirt collar. After the tasing, Kirk and Jones let go of Madison's person and Madison released Harper's shirt collar. Thereafter, Madison fell backwards.

claims, _i.e._, evidence from which a reasonable jury could find that that Kirk, Jones, and/or Harper inflicted unnecessary and wanton pain and suffering upon Madison by failing to guide Madison to the ground after he was tased.  See, e.g., Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).  Rule 56(c)(1) explicitly states that a party asserting that a fact "is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record."  Plaintiffs cannot defeat summary judgment by making conclusory or speculative statements without specific evidentiary support or by piling inference upon inference.  See Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002).

Plaintiffs have failed to produce evidence[33] that when realistically viewed as favorably to Plaintiffs as reasonably possible, would permit a finding that Kirk's, Jones', or Harper's action or inaction after the tasing constituted wanton and sadistic conduct imposed for the purpose of punishment.  At

---

[33]    The Court, at the motion hearing, directed the parties to take Wright's deposition and "provide comments regarding the effect, if any, of [Wright's deposition] transcript upon the Court's consideration of the pending summary judgment motion." Order Re: Wright Deposition [Document 40].  Despite this limitation, Plaintiffs presented additional references to portions of the DC Defendants' depositions in their Supplemental Memorandum regarding Wright [Document 43].  One of such references was Harper's testimony that he saw Madison "tense up just before he fell."  [Document 43] at 20.  Inasmuch as this statement is immaterial, the Court will not strike it.

most, there might be a reasonable contention that Kirk and

Jones[34] acted negligently.

Moreover, there are significant gaps in the evidence. For

example, there is no evidence:

1.  Of the type or model of taser used on Madison;

2.  Of the duration of the tase inflicted upon him;

3.  Of the effects of a <u>single</u> tase of the type and duration used by Huey upon Madison on a person of Madison's height and weight or upon any male adult in general;[35]

4.  That a taser of the type used in this case has the capacity to strip a person of Madison's size of his motor faculties in such a way that the person – if standing when tased – will inevitably or more likely than not fall to the ground without any ability to control himself; and/or

5.  Of the time it would take for a person of Madison's standing to be physically affected by a single tase of the type and duration used.[36]

---

[34]   It is doubtful that Harper could even be found negligent when the evidence indicates no more than that after the tasing, Madison released Harper and not vice versa.

[35]   In their first opposition [Document 25], Plaintiffs assert that after being tased Madison suffered the intended effect of tasing, "neuro-muscular incapacitation" meaning that he was unable to move.  Plaintiffs seek to rely on Huey's affidavit, [Document 22-8] ¶ 12, which does not contain this information, but rather generally provides that the taser "eventually took effect and [Madison] released DFC Harper and fell backwards to the floor."

[36]   The video evidence appears to depict Madison lunging forward out of the holding cell area after deployment of the tase, suggesting that, in reality, it did not have an instantaneous effect.

Even if Plaintiffs were to close these gaps or the Court were to close the gaps for Plaintiffs by taking judicial notice or by relying on statements in other judicial decisions, the Court would still find the evidence inadequate.

Plaintiffs have provided no evidence with respect to Kirk's, Jones', and/or Harper's knowledge regarding the effects of tasing other than brief conclusory references in deposition testimony to "in service" training. Indeed, even if it were reasonable to assume that any taser certification would include an explanation of the physical effects of a tase, Kirk and Jones testified they were not even certified to use tasers as of June 2009. Thus, no reasonable jury could leap to the conclusion that Kirk's and/or Jones' post-tasing actions or inactions were sadistic and malicious. Cf. Azevedo v. City of Fresno, 1:09-CV-375 AWI DLB, 2011 WL 284637, at *9 (E.D. Cal. Jan. 25, 2011) (explaining in Fourth Amendment excessive force case that since "[i]t was understood that the taser would immobilize Azevedo. It should have also been understood that uncontrolled falls are an inherent risk associated with tasers" and concluding reasonable jury could find taser use to be excessive under the Fourth Amendment).[37]

_____

[37]    However, in that case the officer was held entitled to qualified immunity.

C.  <u>Resolution</u>

As discussed herein, the Court shall grant summary judgment to all Defendants on all federal claims.


IV.  STATE LAW CLAIMS

A.  Jurisdiction

The Court shall not accept Defendants' suggestion that it exercise its discretion and decline to exercise supplemental jurisdiction over Plaintiffs' state law claims.  To do so would unnecessarily burden the parties and the state court.  *See* *Semple v. City of Moundsville*, 195 F.3d 708, 714 (4th Cir. 1999).


B.  The "Derivative" Claims

Plaintiffs present claims in Count I (Survival) and Count II (Wrongful Death) that can be referred to as "derivative" claims.  That is, the Counts do not present claims that would, of themselves, impose liability on any defendant.  Rather, the Count would allow a particular plaintiff or plaintiffs to recover on a successful claim made in a substantive Count.


1.  Count I (Survival)

Md. Code Ann., Est. & Trusts § 7-401(y) provides that a

personal representative of a decedent's estate may "prosecute,
defend, or submit to arbitration actions, claims, or proceedings
in any appropriate jurisdiction for the protection or benefit of
the estate."  "Under Maryland Law, only an administrator of the
estate can bring a survival action, not the parents." Munger v.
United States, 116 F. Supp. 2d 672, 676 (D. Md. 2000).

Count I purports to assert a claim on behalf of the Estate
of Dwight Jerome Madison by Plaintiffs as the "Personal
Representative(s) of the Estate of Dwight Jerome Madison."
However, it does not appear that, as of the time of this
writing, any Plaintiff is the Personal Representative of the
Estate of Dwight Jerome Madison.  Therefore, Count I must be
dismissed.  However, inasmuch as the claim in Count I is a
"derivative" claim, the Court shall provide a reasonable time
for a Personal Representative of the Estate of Dwight Jerome
Madison to seek to reinstate the claim.


2. Count II (Wrongful Death)

Under Maryland law, a wrongful death action "shall be for
the benefit of the wife, husband, parent, and child of the
deceased person."  Md. Code Ann., Cts. & Jud. Proc. § 3-904
(a)(1).  However if there is no one that qualifies under (a)(1),
"an action shall be for the benefit of any person related to the
deceased person by blood or marriage who was substantially

43

dependent upon the deceased.  Id. 904(b).

The body of the Amended Complaint does not set forth the
family relation between Plaintiffs and the decedent.  However,
the relationships are stated in the caption.  The Court finds it
appropriate to consider the case caption as part of the Amended
Complaint for purposes of family relationship allegations.
Hence, the Court finds Count II adequate to present a wrongful
death claim on behalf of the Plaintiffs.  The Court shall not
dismiss Count II.


C.  (Count III) Excessive Force/Police Brutality

The Amended Complaint includes Count III, entitled
"Excessive Force/Police Brutality."

The Count does not include a reference to any basis –
statutory, constitutional, common law or otherwise for the
claim.  In the absence of any plausible claim, Count III shall
be dismissed.


D.  (Count IV) Assault and Battery

Defendants contend that state intentional tort claims are
precluded under the Maryland doctrine of common law public
official immunity and that the Amended Complaint fails to allege
any plausible claim of malice necessary to defeat the immunity.

Plaintiffs assert the immunity does not cover intentional torts and is therefore inapplicable to these claims.[38]

The Court shall not _dismiss_ the assault and battery claim in Count IV. Dismissal must be based upon the allegations of fact in the Amended Complaint. The "facts" so alleged are that: the Defendants maliciously inflicted injuries on Madison without proper grounds "while he was presenting no immediate threat to anyone." Am. Compl. [Document 14] ¶ 33. Moreover, the Amended Complaint includes, within Count IV, all of the prior allegations. _Id_. ¶ 32. It suffices to state that these incorporated paragraphs provide factual allegations adequate to present a plausible claim that there was malicious or wrongful action that would negate any "immunity" or defense.[39]

---

[38] Defendants also assert the assault and battery claims are subject to dismissal as barred by the one year statute of limitations. Assault and battery claims are subject to a one year limitation period under Maryland law. _See_ Md. Code Ann., Cts. & Jud. Proc. § 5-105. However, the Detention Center events occurred on June 12, 2009, and the original complaint in MJG-10-197 was filed on January 26, 2010. Accordingly, the original complaint, subsequently amended and filed in this case, was timely.

[39] Under Maryland law, "[c]ommon law public official immunity is reserved for public officials (as opposed to mere employees) who perform negligent acts during the course of their discretionary (as opposed to ministerial) duties." _Houghton v. Forrest_, 989 A.2d 223, 227 (Md. 2010). As stated by the Maryland Court of Appeals, "[f]or more than twenty years, however, this Court has held that common law public official immunity does not apply to intentional torts." _Id._ at 228 (declining to overturn this precedent); _see_ _also_ _DiPino v. Davis_, 729 A.2d 354, 370 (Md. 1999) ("[W]e made clear that a police officer, who might otherwise have the benefit of this

Of course, it is one thing to find that there are adequate factual allegations and another to find that there is adequate evidence to establish those allegations.  That is, the ultimate question is not whether Count IV survives dismissal but whether Defendants are entitled to summary judgment on the claims therein.

While Defendants' motion nominally seeks summary judgment on all claims, the briefing by both sides does not adequately address the question of whether Defendants are entitled to summary judgment on Count IV.  The Court needs to be informed as to the parties respective contentions with reference to the legal and factual issues presented by the claims in Count IV.

Under the circumstances, the Court shall provide that Defendants may file a motion for summary judgment specifically with regard to Count IV to which Plaintiffs may fully respond.

The motion need not be lengthy.  Rather Defendants need only present legal authority to support the defense contention that a peace officer engaged in the <u>proper</u> exercise of his/her duty cannot be held liable for assault and battery in the absence of malice.  It would suffice - to frame the factual issue - for Defendants to state that Plaintiffs have not produced evidence adequate to support a finding for them on

_____

immunity, does not enjoy it if the officer commits an intentional tort or acts with malice.").

Count IV.  In response, Plaintiffs must specify which particular

Defendants they contend can be held liable on Count IV for which

particular actions and present evidence in support of these

particular contentions.


       E.    (Count VII) Intentional/Negligent Infliction,
             Emotional Distress

       In Count VII, the Plaintiffs claim that the actions

resulting in the arrest and death of Madison constituted the

intentional and negligent infliction of emotional distress upon

Madison.[40]

       "Maryland does not recognize the separate and distinct tort

of negligent infliction of emotional distress."  Lapides v.

Trabbic, 758 A.2d 1114, 1122 (Md. Ct. Spec. App. 2000).


       To establish a cause of action for intentional infliction

of emotional distress ("IIED") under Maryland law, a plaintiff

must establish four essential elements:

                    (1)  The conduct must be intentional or
                         reckless;

                    (2)  The conduct must be extreme and
                         outrageous;

---

[40]    At the hearing, Plaintiffs appeared to take the position
that the IIED claim includes a claim that the Defendants
intentionally caused the Plaintiffs – as family members of
Madison – emotional distress.  No such claim was made in the
Amended Complaint.  Nor would any such claim if made be
plausible.

47

        (3)     There must be a causal connection
                between the wrongful conduct and
                the emotional distress; and

        (4)     The emotional distress must be
                severe.

<u>Batson v. Shiflett</u>, 602 A.2d 1191, 1216 (Md. 1992) (quoting

<u>Harris v. Jones</u>, 380 A.2d 611, 614 (Md. 1977)).

     The claim warrants little discussion.  The Amended

Complaint presents conclusory sweeping allegations without

specification of which particular actions were extreme and

outrageous.[41]  There is no specification of any severe emotional

distress.  Indeed, the gravamen of the Amended Complaint is that

Madison was rendered unconscious immediately upon falling.

     The Court shall dismiss Count VII.

V.   <u>CONCLUSION</u>

     For the foregoing reasons,

        1. Defendants', Jason Flemmens, Todd Johnson,
          Jennifer Huey, Emma Virginia Courtney,
          Christopher Jones, Sherman Kirk, Theresa Pounds,
          and Rickey Harper, Second Motion to Dismiss, or
          in the Alternative Motion for Summary Judgment
          [Document 35] is GRANTED IN PART AND DENIED IN
          PART.

---

[41]    To be extreme and outrageous the actionable conduct "must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung."  <u>Hamilton v. Ford Motor Credit Co.</u>, 502 A.2d 1063, 1064 (Md. Ct. Spec. App. 1986).

a. Count I is DISMISSED without prejudice to the right of a duly appointed personal representative of the Estate of Dwight Jerome Madison to move, by September 9, 2013, to be added as a Plaintiff and reinstate Count I.

b. Count II remains pending but, as stated herein, is a "derivative" Count and presents no substantive claim.

c. Count III is DISMISSED.

d. Count IV remains pending.

e. Defendants are granted summary judgment with regard to all claims in Count V.

f. Count VI is DISMISSED.

g. Count VII is DISMISSED.

2. Defendants may, by September 9, 2013, file a motion for summary judgment with regard to Count IV.

a. Plaintiffs shall respond by October 9. 2013.

b. Defendants may file a reply by October 31, 2013.


SO ORDERED, this <u>Friday, August 02, 2013</u>.


_____/s/_____
Marvin J. Garbis
United States District Judge
